**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| DANA BRUBAKER, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | No. 08-1270-MLB |
| | ) | |
| MR. HEATER CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendants' motions to strike the expert opinion of Carl Martin and amend the caption to include Shelter Insurance as a plaintiff. (Docs. 39, 58). The motions have been fully briefed and are ripe for decision. (Docs. 29, 53, 62).

**I.   Facts**

Plaintiff purchased a "Portable Buddy" propane space heater in 2006 which was manufactured by defendants. On February 1, 2007, plaintiff was using the heater in her home. Plaintiff connected the heater to a propane gas storage container with a conventional connector hose. The heater operated for about ten minutes without any problems. Plaintiff then alleges that the heater malfunctioned and started a fire in her home. After the fire, plaintiff filed a claim with her insurance company, Shelter Insurance. Plaintiff was paid $38,235 under the policy. Plaintiff filed this suit against defendants alleging the claims of strict product liability, negligence, and breach of express and implied warranties. Plaintiff

seeks damages in excess of $75,000.

Plaintiff hired Carl Martin, a mechanical engineer, to perform a cause of loss analysis for the fire. Martin has a masters in engineering management from KU and has worked in forensics investigations in cause of loss analysis and fires since 1988. In performing his job, Martin uses his forensic engineering skills to determine the cause of a fire. On a routine basis, Martin evaluates specific appliances to determine if they caused a fire. Martin has issued more than 1000 reports on appliances involved in fires. In his career, Martin has not had the occasion to work for a consumer product company nor has he designed a consumer product.

In this case, Martin read the fire report, examined the heater and read the deposition testimony of the three eyewitnesses to the fire. Martin testified extensively about the inner workings of a propane heater and of the typical causes of fires in relation to those heaters. Martin explained that the eyewitness reports were significant because all witnesses saw flames coming out of the sides of the front face of the heater. Martin opined that this is indicative of over-pressurization which is related to a problem with the heater's internal pressure regulator. Also, Martin testified that another important fact was that none of the eyewitness testified that they smelled gas, which negates the possibility of a leak.

Martin concluded that the most probable cause of the fire was an internal failure of the regulator or gas control valve, meaning that the regulator's internal mechanisms failed to sense the downstream pressure and allowed it to be too great. Martin also opined that there was not a hose leak at the time the fire began and

that the position of the propane in the tank did not cause the fire.

Martin concluded that there was a design and/or manufacturing defect in the regulator but could not identify the specific defect because the heater was burned. In coming to this opinion, Martin did not do any type of analysis on the exemplar heater nor did he review the design specifications for the heater or the manufacturing process.

Defendants move to strike Martin's opinions on the basis that he is not qualified and that his opinions are not reliable. In reviewing defendants' motion to strike expert testimony, the court has considered Federal Rules of Evidence 104(a), 403, 702 and 703, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) and applicable decisions, primarily from the Tenth Circuit. The court also held a hearing on January 25, 2010, at which Martin testified. For the reasons herein, defendants' motion to exclude the opinions of Martin is granted, in part and taken under advisement, in part.

## II. Standards

"Rule 702 sets forth the standard for admission of expert testimony," U.S. v. Fredette, 315 F.3d 1235, 1239 (10th Cir. 2003), and assigns "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) testimony is based upon sufficient facts or data, (2) the testimony is the

-3-

> product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The standards embraced by Rule 702 and Daubert apply equally to scientific testimony and other testimony of a technical nature. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 , 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). A party offering an expert witness bears "the burden of demonstrating to the district court that [the proffered expert is] qualified to render an expert opinion." United States v. Nacchio, 519 F.3d 1140, 1171-72 (10th Cir. 2008); see also Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001). Still, the court's "gatekeeping" role favors admissibility of expert testimony when it is reliable, relevant and helpful to the jury. Burton v. R.J. Reynolds Tobacco Company, 183 F. Supp. 2d 1308, 1311 (D. Kan. 2002). Indeed, exclusion of expert testimony is the exception, not the rule. See Advisory Committee Notes concerning the amendment to Rule 702 (noting that "a review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule.") Daubert is not a discovery vehicle, nor does it supplant in limine motion practice or cross-examination at trail. While a Daubert hearing is a commonly-accepted method of performing the court's "gate-keeping" function, it is not required. United States v. Charley, 189 F.3d 1251, 1266 (10th Cir. 1999)(district court is granted great latitude in "deciding whether to hold a formal hearing.")

The Tenth Circuit summarized the law regarding admission of expert testimony as follows:

> In reviewing whether an expert's testimony

> is reliable, the trial court must assess the reasoning and methodology underlying the expert's opinion. An expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation. The Supreme Court in Daubert listed four nonexclusive factors that a trial court may consider in making its reliability assessment: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community.
>
> Assuming this reliability prong is met, the court will still consider other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility. In essence, the question is whether the reasoning or methodology properly can be applied to the facts in issue.

United States v. Rodriguez-Felix, 450 F.3d 1117, 1122-23 (10th Cir. 2006) (internal footnotes, quotations, and citations omitted). The Daubert standard therefore ensures that the proffered evidence is both reliable and relevant.[1]  Daubert, 509 U.S. at 589.  In assessing reliability under Daubert, the purpose of the inquiry is always the same: "[t]o make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

---

[1] Defendants have not argued that the proposed testimony is not relevant. Rather, defendants have focused on the reliability of the proposed testimony.

-5-

**III. Analysis**

    **A. <u>Daubert</u> Motion**

Defendants put forth two main objections to Martin's testimony. Their first objection can be disposed of summarily. Defendants assert that Martin's testimony should be excluded because he "has never designed a consumer product. . . and has no familiarity with the standards to which the subject heater's design was certified." (Doc. 39 at 9). Defendants, however, cite no authority for the proposition that an engineer must first design a consumer product before he can testify as to any potential defects. Other than this, defendants do not challenge Martin's qualifications as defined by Rule 702, i.e. his knowledge, skill, experience, training or education. But, for the reasons stated, <u>infra</u>, this does not necessarily mean that Martin's opinions are admissible.

Defendants' second objection is that Martin's opinions are not reliable and not based on sufficient facts. In order to establish her product liability claim in this case, plaintiff may put forth expert testimony "that the product was defective." <u>Orth v. Emerson Elec. Co., White-Rodgers Div.</u>, 980 F.2d 632, 636 (10th Cir. 1992). In addition, to prove her claim of breach of an implied warranty, plaintiff "must show that the goods were defective, that the defect was present when the goods left the manufacturer's control, and that the defect caused the injury sustained by plaintiff." <u>Dieker v. Case Corp.</u>, 276 Kan. 141, 162, 73 P.3d 133, 147 (2003).

Martin prepared a written report (Doc. 39, exh. 7) in which he opined that ". . . the most probable cause of the fire was an internal failure of the regulator or gas control valve within the heater." The

report does not state whether the "failure" was due to a design or manufacturing defect; indeed the report does not describe the nature of the "internal failure" at all.

Martin was deposed. He was asked about his opinions and specifically eschewed any opinion regarding a design defect.[2] (Doc. 39, exh. 6 at 52-53, 66). At the hearing, Martin testifed that he had no opinion regarding a design defect:

> Question: And thus you don't have an opinion that a specific design defect caused the fire to occur?
>
> Answer: To that extent, that's true.

(Tr. at 69).

This testimony prevents Martin from expressing at trial any opinion regarding design defect. At a minimum, any expert who intends to opine on a design defect must be familiar with the design of the

---

[2] Q. Okay. All right. Let's go back to the defect analysis. We discussed your manufacturing defect, you described it as a possibility?
A. Yes.
Q. Something went wrong from a manufacturer's process?
A. Yes.
Q. Let's talk about design defect. Are you offering an opinion in this case that there's a design defect in the MH9B portable Buddy heater?
A. I would say I'm offering an opinion that there could be a design defect.
Q. Okay. You have not in your work in this case been able to identify specifically a design defect in the heater?
A. That's true.
Q. Okay. And since you haven't specifically identified a design defect in the heater, you haven't gone through any analysis to say, this design defect caused this fire to occur in this manner?
A. That is true.
Q. So in other words, you don't have with specificity an opinion that a define defect exists, Number 1, yet there's a possibility but not with specificity; right?
A. That's true.
Q. And thus, you don't have an opinion that a specific design defect caused this fire to occur?
A. To that extent, that's true.

-7-

product. Martin did nothing which would serve as a foundation for a design opinion. He did not examine documents pertaining to the heater's design or that pertaining to the regulator or control switch. Indeed, it does not appear that he examined the exemplar heater from a design standpoint.

Defendants' motion to exclude Martin's opinions regarding design (if, indeed he has any) is sustained.

With design defect thus eliminated, the question becomes whether the "internal failure of the regulator or the gas control valve" was due to . . . well, to what? The court is not sure. The jury is going to be instructed on Kansas law pertaining to products liability and, in addition to having no opinion regarding a design defect, Martin apparently has no opinion that the manufacturer breached its duty to inspect, test and warn (PIK 4th, civil, 128.01). This leaves a manufacturing defect in the heater, presumably in the regulator and/or gas control valve.

Martin was asked at his deposition about a manufacturing defect:

> Q. Now, let's go back to manufacturing. Are you offering an opinion in this case that the incident heater contained a manufacturing defect?
>
> A. I would say I'm offering the possibility of a manufacturing defect exists.
>
> Q. Okay. And let's define our terms just so everybody knows what we're talking about. I think you and I do and I'm assuming Alene does, she said she just started doing this product work recently, so . . . . A manufacturing defect, would you agree, is a defect that exists where the incident product does not conform in some manner with the design specifications of the product?
>
> A. That is a good definition, yes.
>
> Q. Okay. Now, in your work in this case, were you able to discern from your examination of the incident

product, as well as your review of an exemplar that there was anything in the manufactured product that didn't meet with the design specifications?

A. No, the damage to the unit was excessive and you couldn't make any comparisons with regard to how it was originally manufactured.

Q. Okay. So it's fair to say that your opinion of the possibility of a manufacturing defect is based upon a certain amount of speculation, because the remains of the heater prevented any analysis of whether there was a manufacturing defect?

A. I would say, to some extent, and also, of course, the additional information provided to me for evaluation.

Q. I don't understand the last part.

A. Meaning that to the extent that there is a deposition that provides some eyewitness accounts of what happened, and then there is a report from a fire investigator indicating where the fire's origin was at.

Q. Okay. So in other words, what you've done is what you've been provided regarding a description of the incident, you're stating that that suggests the possibility of some manufacturing defect may have occurred?

A. That is true.

Q. But as you sit here, you can't identify any particular manufacturing defect that existed in the incident product?

A. Correct.

Q. And you can't identify the manner in which any possible manufacturing defect caused this fire to occur?

A. You might repeat that again.

Q. Yes. You can't identify a specific defect?

A. That's true.

Q. So you can't specifically identify the mechanism by which any potential defect caused a fire?

A. As it relates to the physical evidence that I had, that is true.

(Doc. 39, exh. 6 at 43-45).

Martin's testimony at the hearing was pretty much the same: he did not identify a specific manufacturing defect. The court's overall interpretation of Martin's testimony, based upon the hearing transcript, is that he has eliminated all other possible causes except a failure of the regulator or gas control valve but because the heater was destroyed by the fire, he cannot identify a specific manufacturing defect in either component.

For plaintiff to recover, "liability in a products liability case cannot be based on mere speculation, guess or conjecture. . . It may be based on an expert's learned analysis and assumptions derived from his experience, study and knowledge." Orth, 980 F.2d at 636. The court is not satisfied with the parties' briefing on the admissibility of Martin's opinion, whatever it may, or may not, be. The parties will have another opportunity to specifically identify Martin's opinion and brief its admissibility under the standards established in the Daubert line of cases (including 10th Circuit cases), applicable Kansas cases and PIK instructions as to each theory of recovery plaintiff wishes to pursue. Plaintiff's brief will be due on February 19 and defendants' will be due on February 26, 2010.

**B. Motion to Amend**

Defendants move to amend the caption of the case and add Shelter Insurance as a plaintiff on the basis that it is a real party in interest. Fed. R. Civ. P. 17(a) requires that all actions must be prosecuted in the name of the real party in interest. "A real party in interest is one who owns the substantive right to be enforced." Doyle v. Colborne Mfg. Co., 93 F.R.D. 536, 537 (D. Kan. 1982). "It

-10-

is well settled that an insurance company is a real party in interest to the extent it has reimbursed the loss for which compensation is sought." Garcia v. Hall, 624 F.2d 150, 151 (10th Cir. 1980). "When the insurance company has made only partial reimbursement, both the insurer and the insured are real parties in interest." Id.; see Gas Service Co. v. Hunt, 183 F.2d 417 (10th Cir. 1950). An exception to this rule is when joinder would defeat jurisdiction. Hall, 624 F.2d at 152.

In response, plaintiff contends that this case is different from the cited authority because it was removed to federal court. Plaintiff, however, cites no authority to support her position. Moreover, plaintiff does not controvert defendants' proffer that Shelter Insurance is a Missouri corporation and would not destroy diversity jurisdiction.

Therefore, defendants' motion to amend the caption is granted. Plaintiff must file an amended complaint which names Shelter Insurance as a plaintiff in this action by February 26, 2010.

**IV. Conclusion**

Defendants' motion to strike the expert testimony of Carl Martin is granted, in part, and taken under advisement pending additional briefing. (Doc. 39). Defendants' motion to amend the caption is granted. (Doc. 58).

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in

Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this __11th__ day of February 2010, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE
